[Civ. No. 34325.   Second Dist., Div. One.   June 26, 1969.]

MELANIE RAUSCH, a Minor, etc., Petitioner, v. WORK-
MEN'S COMPENSATION APPEALS BOARD, TERE-
SITA PINES, INC., et al., Respondents.

Everett E. Demler for Petitioner.

Everett A. Corten, Nathan Mudge, Baldwin, Thomas & Baker and Robert D. Baldwin for Respondents.

FEINERMAN, J. pro tem.*—In this proceeding petitioner seeks annulment of an order of the Workmen's Compensation Appeals Board denying her claim for compensation for personal injury. The sole question presented is whether the injury which petitioner sustained when thrown from a horse on August 15, 1967 arose out of and occurred in the course of her employment as a counselor at a summer camp for girls.

Inasmuch as there is no real dispute between the parties as to the facts, the question of whether the injury was suffered in the course of employment is one of law and a purported finding of fact on that question by the appeals board is not binding on this court. (*Reinert* v. *Industrial Acc. Com.*, 46 Cal.2d 349 [294 P.2d 713]).

In the summer of 1967 the petitioner, Melanie Rausch, who was at that time 19 years of age, was employed as a camp counselor by Teresita Pines, Inc., whose compensation insurance carrier was respondent, Phoenix Insurance Company. Teresita Pines, Inc. operated a summer camp for girls between the ages of seven to fifteen which was located in the Los Angeles National Forest, 7 miles from Wrightwood, California, and 103 miles from Los Angeles. The camp had accommodations for 160 girls and was operated from the last week of June to the last week of August. Female counselors, ages 17 to 21, were hired to take care of the campers.

Upon Melanie's application for employment, she was interviewed by representatives of the employer, including Mary

---

*Assigned by the Chairman of the Judicial Council.

Delgatto, the president of Teresita Pines, Inc., and Marian Henning, the camp manager, and on February 28, 1967, Melanie signed a written contract of employment. At the hearing neither Melanie nor the named representatives of the employer could recall that there was any mention of horseback riding at the pre-employment interview. The written contract did not contain any reference to the activity.

The contract provided that, as a counselor, Melanie's duties were: to chaperon, live with and have charge of a cabin or dormitory group; to be responsible for this group in routine camp duties and be with the group at rising time, during rest hours, before and during meals and from campfire to taps; to assist campers to participate in programs outlined by the program director, activity leaders and unit leaders; to assist other counselors who were in charge of special activities as occasion would arise and to assist in various camp functions, especially during an emergency; to comply with all rules and regulations; and to be subject to the final authority of the camp manager. The contract did not describe the particular programs and activities contemplated. It provided that, as a counselor, petitioner would be "off duty" one day each week. It set forth certain restrictions in respect to smoking, regulated the use of private cars and a truck, and restricted counselors under 21 years of age from leaving camp with boy friends. As consideration for her services, the contract provided that Melanie would receive transportation from Los Angeles and return, board, room, laundry, a payment of $135 at the end of the camping season or a pro-rata share thereof for time served, treatment for minor illness and first aid, and certain insurance protection for illness and accident.

In May of 1967 Melanie and other counselors attended an orientation meeting at which they were told by camp representatives to bring along jeans for horseback riding. The counselors were also advised that they would be required to take the campers on both daytime and overnight horseback rides; that horses would be available for riding, and that they should bring extra spending money if they wanted to ride or go into town.

A brochure relating to the 1967 camp program contained a picture of about 15 younger girls and two older girls on horseback. It stated that horseback riding would be available and that the permission of parents was necessary. In the proceedings on her claim, Melanie and Lynn Bruce, another counselor, testified that they had received copies of this bro-

chure in the mail with their application forms. At an initial hearing Melanie testified that she accepted the employment before she knew that horseback riding would be among the activities, but at a second hearing she testified that her prior testimony was in error. Mary Delgatto, the president of the employer, testified that "as far as she knew" copies of the brochure had not been given to or shown to the counselors. However, she admitted the brochures were available at the office and could be picked up at that location.

The counselors lived on camp premises in cabins with groups of campers. The camp premises did not include riding facilities and the camp did not own any horses. The nearest stable was the Big Pines Mountain Stables, which was located about 4 miles from the camp. After the counselors arrived at the camp, they were taken to the stables by the counselor supervising horseback riding and were taught how to ride. The regular riding program for campers included two daytime rides and one overnight ride each week, and it was conducted by using the facilities of the Big Pines Stables. All riding took place in the mountains because camp rules prohibited riding on the camp premises. The campers each paid $3.00 an hour for horses to the operators of the stable. The stable furnished transportation by truck between the camp and stable and provided, without charge, a horse for each counselor riding with the campers. Counselors who rode on their days off were charged $1.50 per hour, one-half of the regular hourly rate.

Melanie carried out the duties of a counselor for eight weeks of the nine-week camp session. During this period she went on rides with the campers two or three days a week, and once she rode in her free time. August 15, 1967 was her day off. She went to mass, cleaned her cabin, and attended a meeting of counselors and camp officers. These activities were considered to be part of her duties, and she was "free to leave for awhile" after their completion. She and Lynn, who corroborated her testimony, obtained the permission of the camp manager and rode to the Big Pines Stables in a car with another counselor who was driving to town. She paid the discount counselor rate of $1.50 an hour for a horse. The injury occurred in the nearby mountain area, off the premises of the employer.

Marian Henning, the camp manager, testified that in addition to one day off each week, the counselors had four hours off each day; that on days off a counselor could go home or do

whatever she desired *when she had transportation*; that in addition to riding, they could hike or go to Wrightwood for a few hours; that they were under her supervision every day of the week; that she had to know *at all time*s where they were and what they were doing because of fire hazards and to protect the good reputation of the camp; that the counselors were required to obtain her permission to leave and were required to check in with her upon their return; that even on their days off the counselors were *"on call,"* but when she wanted them to do something, they *"*did not need to do it unless they wanted to;*"* that she gave them consent to go riding at the stable and knew they went riding there, but she did not *"*expect*"* them to go riding on their time off.

The camp manager further testified that when she permitted petitioner and another counselor to go riding on the date of the injury, she expected them to return to camp in one or two hours, but that no work at camp was planned for them for the balance of the day. Mary Delgatto, the president, testified that she knew that on their days off counselors went riding away from the premises of the camp, and she admitted that she had told Melanie some time after the accident that the girl's injury was deemed to have been sustained *"*on-the-job.*"*

In contesting the claim for compensation, respondents contended that because petitioner had the day off, paid for the use of the horse, was at a place remote from the employer's premises, and was rendering no service to the employer at the time of injury, the injury did not arise out of or occur in the course of employment. Respondents asserted that the cases of *Liberty Mut. Ins. Co.* v. *Industrial Acc. Com.*, 39 Cal.2d 512 [247 P.2d 697] and *Arabian American Oil Co.* v. *Industrial Acc. Com.*, 94 Cal.App.2d 388 [210 P.2d 732] had analagous factual situations and were controlling.

In advancing her claim, petitioner relied primarily upon the case of *Reinert* v. *Industrial Acc. Com.*, *supra.* That case also involved an injury to a girl counselor while horseback riding in her free time. In *Reinert,* the employee was a counselor at a Girl Scout camp. At the interview for her employment, the employer had explained to her that horseback riding as a counselor assisting younger girls would be part of her duties; that while on duty she would pay no charge for the horse; that during free time she would be privileged, upon obtaining permission from the camp director, to go riding;

and that part of the compensation for the job was the availability of recreational activities which would not otherwise have been available to her. Each employee was on duty 24 hours a day, except for one 24-hour period each week. During the on-duty hours, if the employee was not needed for the actual work of the camp, she could, upon obtaining permission, engage in recreational activities of her own choosing. When her duties so permitted, she was required to obtain permission for the precise recreational activity away from the camp in which she wished to engage.

Prior to her injury, the petitioner in *Reinert* had gone horseback riding some six times, three of them without charge to her because she rode as a counselor accompanying Girl Scouts, and three times for her own recreation, for which she was charged a reduced rate of $1.00 per hour by the stable. Horses were procured at a stable located a half mile from the camp through an arrangement whereby the campers and counselors could ride at a lower rate than that charged the general public. In holding the injury to be compensable, the Supreme Court stated: ''It is apparent from the evidence heretofore set forth that recreational horseback riding during her free time was considered as part of the compensation to be paid by the employer for petitioner's work; that she was both encouraged and permitted to go horseback riding in her free time during working hours at lower rates arranged by the employer with the stable. In addition, it appears inferentially, that the Wilson Stables was the only one in the area available to the Girl Scouts and their counselors.

''. . . The record here clearly shows that petitioner's wage was low; that it had been difficult to procure counselors for the camp; that it was specifically contemplated by the employer that the use of the available recreational facilities was considered 'compensation' for the long hours and exacting work.

''. . . We conclude, therefore, that recreational horseback riding was considered by both employer and employee as part of the compensation; that such consideration was the practice of the employer; and that the danger from which the injury resulted was 'one to which he [the employee] is exposed as an employee in his particular employment.' [Citations]. Here, as in the *Winter*[1] case, petitioner's injuries arose from the very

---

[1]Referring to *Winter* v. *Industrial Acc. Com.*, 129 Cal.App.2d 174, 176, 177 [276 P.2d 689], where the court annulled an order of the commission

risk to which she was exposed as part of her duties—riding as a counselor with the Girl Scouts.''

In denying compensation for personal injury, the referee in this case placed special emphasis on the terms of the written contract of employment signed by Melanie in February 1967 and the colloquy between her and the representatives of the employer at the initial pre-employment interview. The referee concluded that the controlling facts in *Reinert* were not present here; that when the applicant in *Reinert* entered into her employment as a counselor, she was told that in her free time she could engage in horseback riding; that in this case ''riding of horses during recreational periods by the applicant was not part of the 'contract of hire'' and thus was not offered as an inducement and considered to be a part of the compensation provided under the terms of the contract of employment.

The appeals board affirmed the findings of the referee and denied reconsideration, stating in its opinion its conclusions as follows: ''When applicant accepted the job she was not advised that the horses would be available for riding, she learned this later. She was told that she could ride horses if she wanted to. The permission of her supervisor was not necessary for her to go riding, but she was told to report at anytime when she left the premises, and to check in on her return. The horseback riding facilities were not offered as part of the compensation for the work and were not held out as an inducement for employment. On the contrary, horseback riding was a recreational activity, like others in which the employees were free to engage in if they so desired in their own free time. There is no persuasive evidence in the record that horseback riding was part of the compensation to appli-

---

which denied compensation to a caddy who lost an eye as a result of being struck by a golf ball. The caddy was permitted to play, without charge on his day off, on the golf course where he was employed. At the time of his employment, the caddy did not know that such permission could be obtained. It was during such free play on his day off when he received his injury. The court held that the injury was sustained in the course of petitioner's employment; and as an additional argument in favor of recovery, the court said: ''The essential prerequisite to compensation is that the danger from which the injury results be one to which he is exposed as an employee in his particular employment. (*Industrial Indem. Co. v. Industrial Acc. Com.*, 95 Cal.App.2d 804, 809 [214 P.2d 41].)'' The court said, further, that ''He [petitioner] was engaged at the time in a recreational activity, both permitted and, in the light of the facts, sufficiently encouraged by the employer, which permission and encouragement were conditioned solely upon the fact that he was a caddy employed by the club. For that reason, and for no other, he was permitted to play on the course. . . .''

cant for her work or offered as an inducement for her to enter the employment. Other than the requirement that the camp supervisor be notified before counselors left the camp grounds, there were no restrictions or requirements as to the free time activities of the counselors. We are of the opinion that the cited evidence and other evidence in the record fully justifies the Findings of the Referee.''

■ At the outset it is important to observe that the referee and the board have both narrowly, and we believe unreasonably, interpreted the nature of the ''contract of employment.'' The employment relationship was not shaped solely by the agreement executed in February and the initial interview. All of the events which occurred thereafter, including the instructions given at the indoctrination meeting held in May of 1967, and the policies and practices of the camp supervisors during the summer session, were factors to be evaluated in the ultimate determination of the nature of the ''contract of employment.'' See *Employers' etc. Corp.* v. *Industrial Acc. Com.*, 37 Cal.App.2d 567, 573 [99 P.2d 1089] where the court stated: ''The true rule to be derived from the cases is that the injury is compensable if received while the employee is doing those reasonable things which his contract of employment expressly or *impliedly* authorizes him to do.'' (Italics added). The test set forth in *Employers' etc. Corp.* is cited with approval in *Pacific Indem. Co.* v. *Industrial Acc. Com.*, 26 Cal.2d 509, 513 [159 P.2d 625] where an employee was drowned while washing in a reservoir on his way to his employer's office to collect his pay.

■ In the instant case, it is true that there was no express representation by the employer that recreational facilities, including horseback riding, were available and would be considered compensation to the employee; but on the evidence in the record it would be unreasonable not to imply that these activities were contemplated by the employment. Horseback riding was a risk to which the petitioner's employment in the mountains took her. She was required to participate in horseback riding with her campers as part of the formal camp program. Prior to the commencement date of her services, petitioner was told to take her jeans along and told she could ride horses in her spare time and told to bring spending money for that purpose. There was available at the same stable utilized for camper riding—the closest stable to the camp—a special discount rate of $1.50 an hour for counselors.

In *California Cas. Indem. Exchange* v. *Industrial Acc.*

*Com.,* 21 Cal.2d 751, 758 [135 P.2d 158] an injured employee had the implied consent of the employer to go on personal errands during working hours. The court stated that it was not indispensable to recovery that the employee be rendering service to the employer at the time of the injury if the act was contemplated by the employment. The court held that any reasonable doubt as to whether an act was contemplated by the employment, in view of this state's liberal policy of construction in favor of the employee, should be resolved in favor of the employee. (See also *Reinert* v. *Industrial Acc. Com., supra*).

It also appears that the appeals board drew the inference, apparently from the camp manager's testimony, that the camp counselors were free to go where and when they pleased on their free time without permission as long as they reported when they left the camp and checked in on their return. Such an inference we believe is unwarranted. The only reasonable inference to be drawn from the evidence is that the activities in which the counselors were permitted to engage were closely controlled by the camp manager whose permission was an absolute prerequisite to leaving the premises, and that such control was maintained not only for purposes related to fire hazards in the area, but also for the purpose of restraining the counselors from activities which might reflect on the reputation of the camp as a place where high moral standards were encouraged and applied.

Both the *Liberty Mut. Ins. Co., supra,* and *Arabian American Oil Co., supra,* cases are readily distinguishable from the factual situation presented herein.

In *Liberty Mutual* the applicant, Dahler, was a college student who was employed as a dishwasher and helper by the operator of a store and restaurant in a summer resort. His duties were to serve meals, open and operate the store a few hours in the morning, deliver goods and telephone messages to cabins, and once a week to unload a supply truck. He had no recreational duties or responsibilities. During a two-hour free time period one afternoon, the applicant went swimming in a stream about 10 blocks from the restaurant. He suffered a severe injury when he dove into the water and struck a mud bank beneath the surface of the stream.

In holding the injury to be noncompensable, the Supreme Court concluded that there was no connection between the recreational activity pursued and the employment. The court stated at page 516: " 'There must be some connection

between the injury and the employment other than the mere fact that the employment brought the injured party to the place of injury.' (*California Casualty Indem. Exchange* v. *Industrial Acc. Com.*, 190 Cal. 433, 436 [213 P. 257].) The mere fact that Dahler as Swafford's employee had permissive use of the recreational area beyond the employer's premises does not give rise to blanket protection under the compensation law. Rather, Dahler's swimming activities, unrelated to the employment, remote from his place of work and its risk, pursued as an off-duty personal diversion in the employee's free time, in an area beyond the dominion and control of his employer, and yielding neither advantage nor benefit to the employer, must be held to have been wholly without the compass of the compensation law. (*Arabian American Oil Co.* v. *Industrial Acc. Com.*, 94 Cal.App.2d 388, 392-393 [210 P.2d 732].)

"Clearly distinguishable are the cases cited by respondents to the effect that employees sustaining injury while engaged in the performance of personal acts reasonably and necessarily contemplated by the employment come within the protection of the compensation law."

Here, Melanie's riding activities were directly related to her employment. They were not remote from her "place of work and its risk" because the record indicates that her employer utilized the facilities of Big Pines Stables as an adjunct of the camp. The stable was the closest riding facility to the camp and all of the camp's riding activities were conducted there. The stable and surrounding terrain were the exact areas where the petitioner worked regularly on the days that she rode with her campers. Moreover, unlike the factual situation in *Liberty Mutual*, Melanie had to obtain permission from her employer even to go riding on her day off.

We cannot measure with any degree of certainty whether or not Melanie's leisure time riding yielded any advantage or benefit to her employer, but it is not unreasonable to assume that improvement of her riding skills would result in improved performance of her duties as an employee.

The *Arabian American Oil* case is also distinguishable on similar grounds. Another significant difference between the two cases is the fact that in this case the contract of employment placed substantially all of the petitioner's activities under the employer's control. While the witnesses and the employment contract used the term "day off," and the camp manager testified that the petitioner did not have to do what she told her to do on her "day off," to assume that the

petitioner was completely free to do as she pleased is to ignore her minority status and the severely structured camp setting in which Melanie lived and worked.

The appeals board and this court are bound by the fundamental principle that to effectuate the purposes of the compensation statute, all reasonable doubts as to whether an injury is compensable are to be resolved in favor of the employee. (*California Comp. & Fire Co.* v. *Workmen's Comp. App. Bd.*, 68 Cal.2d 157 [65 Cal.Rptr. 155, 436 P.2d 67].)

The order is annulled.

Wood, P. J., and Thompson, J., concurred.

The petition of respondents Teresita Pines, Inc., and Phoenix of Hartford Insurance Co. for a hearing by the Supreme Court was denied August 20, 1969.